**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Clerisy Corporation, et al., | ) CV 12-2110-PHX-PGR |
| Plaintiffs, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| Airware Holdings, Inc., et al., | ) |
| Defendants. | ) |
| | ) |

After holding a *Markman* hearing on June 10, 2013, the Court enters the following claim construction Order.

**I. Background**

Plaintiff Reed Transition Technologies, LLC, is the owner by assignment of United States Patent No. 6,295,982 ("the Patent"), issued by the United States Patent and Trademark Office ("PTO") on October 2, 2001. (Doc. 59, Ex A.) The Patent is for an "Apparatus for and Methods of Administering Volatile Substances into an Inhalation Flow Path." (*Id.*) Plaintiff Clerisy Corp. manufactures, markets, and distributes Aromahaler® Nasal SoftStrips™ using the patented apparatus. Defendants market, sell, and distribute "AIR" branded nasal products, which, like the Nasal SoftStrips, are infused with aromatherapeutic essential oils.

Plaintiffs allege that Defendants are infringing the Patent. On July 26, 2012, they filed

a complaint in the Western District of New York. The case was transferred to the District of Arizona in October 2012. Plaintiffs filed an amended complaint on November 11, 2012. (Doc. 59.) Defendants filed an answer and counterclaims on December 6, 2012. (Doc. 62.)

The parties have asked the Court to construe eight of the Patent's claim terms. Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), the Court must construe the claims as a matter of law. The parties have filed briefs supporting their proposed constructions of the terms. Having considered the arguments and evidence presented in the parties' briefs, exhibits, and at the *Markman* hearing, the Court construes the disputed terms as set forth below.

## II.  Legal standards

Section 112 of the Patent Act provides that a patent specification "shall contain a written description of the invention, and of the manner and process of making and using it in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112. The section further provides that a specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.* "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed.Cir. 2004)).

Claim construction, which is the determination of the meaning of the terms in a patent, is a question of law exclusively within the province of the Court. *Markman*, 517 U.S. at 372. To interpret claims, the court first considers the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996). The court should "look to the words of the claims themselves," giving them "their ordinary and customary meaning," unless clearly stated otherwise. *Id.* The "ordinary and customary" meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the

1   time of the invention." *Phillips*, 415 F.3d at 1313 (9th Cir. 2005); *see also Texas Digital Sys.,*

2   *Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir. 2002) ("The terms used in the claims

3   bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that

4   would be attributed to those words by persons skilled in the relevant art.").

5        After the claims themselves, the court looks to the patent specification. *Vitronics*, 90

6   F.3d at 1582. The specification is highly relevant to the claim construction analysis and

7   usually is dispositive. *Phillips*, 415 F.3d at 1315. The specification is the single best guide

8   to the meaning of a disputed term. *Id.* Courts therefore relies heavily on the written

9   description of the claims in the specification for guidance when conducting claim

10  construction. *Id.* at 1317.

11       The specification may give a special definition to a claim term that differs from the

12  meaning it otherwise would have. *Id*. at 1316. In such cases, the inventor's special definition,

13  or lexicography, governs. *Id.* In other cases, the specification intentionally may disclaim or

14  limit the scope of the claim. *Id*.

15       When reviewing the specification, however, courts must avoid reading limitations

16  from the specification into the claims. *Id*. at 1323. To avoid importing limitations, the court

17  must consider the purposes of the specification, which are to teach and enable those of skill

18  in the art to make and use the invention and to provide the best way for doing so. *Id*.

19       In addition to the claims themselves and the specification, courts should consider the

20  patent's prosecution history. *Phillips*, 415 F.3d at 1317. The prosecution history consists of

21  the record of the proceedings before the PTO and includes the prior art cited during the

22  examination of the patent. *Id*. The prosecution history, which is part of the "intrinsic

23  evidence," provides evidence of how the PTO and the inventor understood the patent. *Id*. The

24  prosecution history often informs the meaning of the claim language by demonstrating how

25  the inventor understood the invention and whether the inventor limited the invention in the

26  course of the prosecution, thereby making the claim scope narrower than it otherwise would

27  be. *Id*.

28

1  Although the intrinsic evidence is the most important for claim construction, the court
2  also may rely on extrinsic evidence if necessary. Extrinsic evidence is all evidence external
3  to the patent and prosecution history, such as expert and inventor testimony, dictionaries, and
4  learned treatises. *Id*. Although it may prove useful, extrinsic evidence is less significant than
5  the intrinsic record for determining the meaning of claim language. *Id*. In most situations,
6  analysis of the patent and its prosecution history will resolve any ambiguity in a disputed
7  claim term. *Vitronics*, 90 F.3d at 1583.

8  "Ultimately, the interpretation to be given a term can only be determined and
9  confirmed with a full understanding of what the inventors actually invented and intended to
10 envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250
11 (Fed.Cir. 1998) (citing *Markman*, 517 U.S. at 389). "The construction that stays true to the
12 claim language and most naturally aligns with the patent's description of the invention will
13 be, in the end, the correct construction." *Id*. Therefore, "[a] claim construction is persuasive,
14 not because it follows a certain rule, but because it defines terms in the context of the whole
15 patent." *Id*.

### III. Discussion

16
17 The parties agree that the "key teaching" of the Patent is "introducing a vapor of
18 volatile substance into an inhalation flow path." The abstract of the patent reads: "A method
19 of introducing a vapor of a volatile substance into an inhalation flow path of a respiratory
20 organ, the method comprising the steps of providing a carrier having a volatile substance and
21 engaging the carrier at the inhalation flow path of the respiratory organ." (Doc. 59, Ex. A.)

22 The patent includes 17 claims. (*Id*.) Plaintiffs accuse Defendants of infringing claims
23 1, 11, and 15. (*Id*.) Claims 1 and 11 are independent claims. (*Id*.) They are directed,
24 respectively, to a method and a vehicle for "introducing a vapor of at least one volatile
25 substance into an inhalation flow path of a respiratory organ." (*Id*.) The method comprises
26 the steps of:

27
28 providing a carrier conformable to a surface of the skin;

providing the carrier with at least one volatile substance;

providing a barrier coupled to a surface of the carrier, the barrier being substantially impermeable to the one or more volatile substances carried by the carrier; and

engaging the carrier to the surface of the skin proximate an inhalation flow path of a respiratory organ with the barrier adapted to be interposed between the carrier and the skin to prevent the one or more volatile substances from contacting the skin.

(*Id.*)

All of the disputed terms are in Claims 1 and 11. The parties' proposed constructions of the terms are set forth in their opening claim construction briefs. (Docs. 85, 88.)

The chart below summarizes the Court's construction of the contested claim terms. It is followed by the Court's supporting analysis.

| Disputed Claim Term | Construction |
|---|---|
| Volatile substance | "A substance that readily vaporizes or evaporates." |
| Carrier | "The portion of the vehicle or device that carries or provides at least one volatile substance." |
| Barrier | "The portion of the vehicle or device that prevents contact between the skin and the volatile substance." |
| Coupled to | "Connected to." |
| Substantially impermeable to one or more volatile substances | "Preventing passage of most or all of the one or more volatile substances." |
| Proximate an inhalation flow path | "Close to or within the entrance to the mouth and/or the nasal passages and not on the bridge of the nose." |
| Engaging the carrier to a surface of the skin | "Attaching the vehicle to the skin." |
| Means for engaging the carrier to the surface of the skin | Function: "Attaching the vehicle to the skin proximate an inhalation flow path." Structure: "Adhesive, clamp, deformable element, or deformable member." |

**A.    "Volatile substance"**

Claims 1 and 11 refer to a method and vehicle "providing the carrier with at least one

volatile substance." Plaintiffs define "volatile substance" as "a substance that is readily vaporizable, including, for example, essential oils." Defendant propose the following construction: "a liquid or solid material that readily evaporates at ambient pressure and temperature."

The parties agree that "the technical meaning of a volatile substance is a substance that readily transitions to a gas or vapor (i.e. vaporizes)" (Doc. 89 at 3) or "a substance that readily vaporizes or evaporates" (Doc. 91 at 7). Defendants argue, however, that Plaintiffs' construction is incomplete and potentially misleading. They contend that it is accurate to qualify "volatile substance" with the phrase "liquid or solid" because a substance that vaporizes is by definition not a gas. (*Id.*) They also argue that adding the phrase is appropriate because "volatile substance" is a "technical chemistry term that a lay jury may not know." (*Id.* at 4.) Defendants likewise assert that the phrase "at ambient pressure and temperature" is technically accurate and proper. (*Id.* at 5.)

Plaintiffs argue that it is inappropriate to read these additional limitations into the specification. The Court agrees. "Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 836 (Fed.Cir. 1991). Neither of the limitations proposed by Defendants is required, nor would a jury would not fail to understand what is meant by "substance" or "readily"

Accordingly, the Court will construe "volatile substance" as "a substance that readily vaporizes or evaporates."

**B.   "Carrier," "Barrier," "Substantially impermeable to one or more volatile substances," and "Coupled to."**

Claims 1 and 11 specify a vehicle and method "providing a barrier coupled to a surface of the carrier, the barrier being substantially impermeable to the one or more volatile substances carried by the carrier."

Plaintiffs define "carrier" as "a portion of the vehicle or device that carries or provides

at least one volatile substance." Defendants propose the following construction: "a distinct layer comprised of a substantially absorbent material that can take up and hold the volatile substance, while allowing the release of the vapor of the volatile substance." Plaintiffs define "barrier" as "a portion of the vehicle or device that prevents contact between the skin and the volatile substance." Defendants propose "a distinct layer comprised of a different material than the carrier that prevents the volatile substance from contacting the skin."

In support of their proposed constructions, Defendants assert that "carrier" and "barrier" must be defined as separate and distinct layers, composed of different materials, because the two layers perform opposing functions. Defendants note that the vehicles disclosed in the specification are composed of distinct barrier and carrier layers, and that "in describing four of the five embodiments, the patentee explicitly states that the vehicle is 'comprised of a series of layers.'" (Doc. 85 at 3.) Defendants also argue that the "carrier" must consist of a "substantially absorbent material" and that the term "portion," as used by Plaintiffs, is too broad.

Plaintiffs counter that the claims of the Patent require only the presence of a "carrier" and "barrier" in the vehicle or device. There is no requirement of "distinct layers," and the phrase does not occur in the claims. Plaintiffs argue that a single material can be used as a "carrier" and a "barrier." They further assert that the manner in which the vehicle carries a volatile substance while preventing contact with the skin is a design choice. Therefore, although a "carrier" *may* consist of a substantially absorbent material, as it is in one of the design choices described in the Patent, such a definition is not required.

The Court finds Plaintiffs' position more convincing, and will adopt their proposed constructions of "barrier" and "carrier." Plaintiffs correctly note that "Defendants' proposed constructions rely on limitations imported from the specification into the claims." (Doc. 91 at 2.) As the court explained in *Phillips*, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. . . . In particular, we have expressly rejected the contention that

if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." 415 F.3d at 1323; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed.Cir. 2004) (reiterating that "this court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

Furthermore, "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326 (Fed.Cir. 2002) (quoting *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed.Cir. 1983)). In *Teleflex*, the court ruled that the term "clip" was not confined to the embodiment described in specification, which would limit "clip" to a structure having a single pair of legs. 299 F.3d 1313, 1326–28. The court explained that there were no clear statements in the specification or prosecution history indicating that the scope of claim should be so limited, noting, for example, that "[t]he language of asserted claim 1 does not support limiting the claim to a 'single pair of legs.' Neither 'single' nor 'pair of legs' appears in claim 1." *Id.* at 1327. The court concluded that the district court "erred by importing the 'single pair of legs' limitation from the specification into the claim." *Id.* at 1328.

A similar analysis applies to Defendants' attempt to import into claims 1 and 11 the limit of "distinct layers." The phrase "distinct layer" does not appear in the claims or the specifications. Defendants note that the embodiments describe vehicles containing carrier and barrier layers. Similarly, Defendants assert that because all of the embodiments disclosed in the specification include a carrier made of a substantially absorbent material, the term carrier must be so defined. Again, however, it is improper to confine a claim to the embodiments set forth in the specification. Moreover, "the specification need not describe every embodiment of the claimed invention." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed.Cir. 2001); *see Epistar Corp. v. International Trade Com'n*, 566 F.3d 1321, 1337 (Fed.Cir. 2009) (rejecting accused infringer's argument that the term "substrate" had to have a certain

1   thickness, provide structural support, and be limited to a single layer since the disclosure in
2   the specification was only for an "exemplary" embodiment).

3       Plaintiffs also argue that the "distinct layer" limitation would improperly exclude "an
4   embodiment disclosed in the specification in which the carrier is comprised of several layers
5   sandwiched together." (Doc. 91 at 3.) This embodiment includes a carrier that consists of two
6   other members "sandwiched together with a suitable adhesive and each consisting of a
7   natural or synthetic sponge-like or substantially absorbent," with a "macrocapsule containing
8   one or more volatile substances" captured between the members. (Doc. 86-1, col. 6, ll. 8-12,
9   and FIG. 16.) As Plaintiffs note, in this embodiment the carrier, being comprised of two
10  members and a macrocapsule, cannot accurately be defined as a "distinct layer." Courts
11  "normally do not interpret claim terms in a way that excludes embodiments disclosed in the
12  specification." *Oatey Co. v. IPS Corp.*, 514 F. 3d 1271, 1276 (Fed.Cir. 2008). For this reason
13  too, the "distinct layer" limitation is not properly imported into the claim.

14      In addition, Defendants' proposed construction of carrier is inappropriate under the
15  doctrine of claim differentiation, which holds that "the presence of a dependent claim that
16  adds a particular limitation raises a presumption that the limitation in question is not found
17  in the independent claim." *Liebel–Flarsheim*, 358 F.3d at 910; *see Curtiss–Wright Flow*
18  *Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed.Cir. 2006) (explaining that "claim
19  differentiation takes on relevance in the context of a claim construction that would render
20  additional, or different, language in another independent claim superfluous"); *Phillips,* 415
21  F.3d at 1315 ("The presence of a dependent claim that adds a particular limitation gives rise
22  to a presumption that the limitation in question is not present in the independent claim.").
23  Furthermore, independent claims are generally given broader scope so as to avoid rendering
24  corresponding dependent claims redundant. *Id.* at 1324 (citing *Dow Chem. Co. v. United*
25  *States*, 226 F.3d 1334, 1341 (Fed.Cir.2000)).

26      Dependent claim 12 describes a "vehicle of claim 11, wherein the carrier includes a
27  substantially absorbent member." Therefore, there is a presumption that the "substantially

28

1   absorbent member limitation," contrary to Defendants' construction, is not found in

2   independent claim 11. Defendants are correct that the written description can overcome the

3   claim differentiation presumption in certain circumstances, but those circumstances are not

4   present here. The effect of ignoring the doctrine in this case "would render the dependent

5   claims superfluous or even invalid." *Abbott Laboratories v. Sandoz, Inc.*, 529 F.Supp.2d 893,

6   907 (N.D.Ill. 2007).

7         Next, Plaintiffs define "substantially impermeable to one or more volatile substances"

8   as "preventing passage of most or all of the one or more volatile substances." Defendants

9   argue that the phrase does not need to be construed beyond its plain meaning. The Court will

10  adopt Plaintiffs' construction, which is consistent with the ordinary and customary meaning

11  of the words, and accurately describes the function of the barrier as set forth in the

12  specification.

13        Finally, Plaintiffs define "coupled to" as "connected or adjacent to." Defendants

14  propose the following definition: "the distinct carrier layer is affixed to the distinct barrier

15  layer." The parties agree that "connected" is a fair construction of "coupled to." (Doc. 85 at

16  12.)

17        Plaintiffs argue that their definition is consistent with the construction of the term

18  adopted by the court Federal Circuit in *Johnson Worldwide Associates, Inc. v. Zebco Corp.*,

19  175 F.3d 985, 992 (Fed.Cir. 1999), which held that the "clear meaning" of coupled "is not

20  limited to a mechanical or physical coupling." Defendants counter that this definition is

21  inappropriate because a physical or mechanical coupling is required to connect the barrier

22  to the carrier; mere adjacency would not hold the carrier and barrier together. They also cite

23  the American Heritage Dictionary, which defines "adjacent" as "Close to; lying near" and

24  "Next to; adjoining."

25        The Court finds neither party's definition of "couple to" satisfactory. While the Court

26  has rejected Defendants' "distinct layers" limitation on the terms barrier and carrier, it

27  concludes that Plaintiffs' proposed construction is overly expansive. "Adjacent," which can

28

1  be defined as merely close to or near, is not consistent with Plaintiffs' characterization of

2  their claims, which describe the carrier and barrier as being connected rather than merely

3  near each other. Accordingly, the Court will construe the term "coupled to" as "connected

4  to."

5  **C.    "Proximate an inhalation flow path," "Engaging the carrier to a surface of the**

6  **skin," and "Means for engaging the carrier to the surface of the skin."**

7  Claims 1 and 11 specify a vehicle and method "engaging the carrier to the surface

8  of the skin proximate an inhalation flow path of a respiratory organ with the barrier adapted

9  to be interposed between the carrier and the skin to prevent the one or more volatile

10  substances from contacting the skin." The parties' proposed constructions of these terms

11  address the placement of the device and the mechanism by which it is held in place.

12  Plaintiffs define "proximate an inhalation flow path" as "close to or within the

13  entrance to the mouth and/or the nasal passages." Defendants' proposed construction is

14  "substantially immediately adjacent to the nasal or oral cavity openings, and not on the

15  bridge of the nose or inserted into the nasal cavity openings."

16  The parties agree that "'proximate an inhalation flow path' means 'close to' or

17  'substantially immediately adjacent to' the openings of the mouth (oral cavity) or nasal

18  passages." (Doc. 89 at 14.) Defendants contend, however, that "the plain meaning of 'close

19  to' or immediately adjacent to' does not include <u>inside of</u>." (*Id.*)

20  Plaintiffs argue that their construction of the term is supported by the specification,

21  which includes embodiments where the device is inserted into the nose. They note that the

22  specification for vehicle 20 states that "the entrance of mouth 22 and entrances of nose 23

23  as defined by the external openings into each of the nasal passages define inhalation flow

24  paths" and that "vehicle 20 is preferably worn against the skin adjacent or otherwise in one

25  or more of inhalation paths 24 and 25." (Doc. 86-1, Col. 3, lines 14–19, 58–64). Figure 4 also

26  shows the vehicle inserted into the nose.

27  Defendants assert, however, that the prosecution history shows that Plaintiffs

28

- 11 -

1   disclaimed any embodiments in which the devise is inserted into the nose. (Doc. 85 at

2   13–15.) According to Defendants, this disclaimer supercedes the embodiments in the

3   specification.

4           During prosecution of claims, the Examiner cited U.S. Pat. Nos. 5,706,800 to Cronk

5   ("Cronk") and 888,869 to Clark ("Clark"). (Doc. 86, Ex. G.) The Cronk reference discloses

6   a nasal dilator strip attached to the bridge of the nose. (*See* id., Ex. F). Defendants argue that

7   the "patentee unambiguously gave away embodiments of a device that is attached to the

8   bridge of the nose." (Doc. 85 at 14.) Plaintiffs acknowledge that the patentee distinguished

9   his invention from Cronk by stating that "Cronk does not teach the use of a vehicle proximate

10  the inhalation flow path. The bridge of the nose is a substantially [sic] distance form [sic] the

11  flow path." (*Id.*, Ex. H at 9.) Plaintiffs note, however, that "the accused products in this case

12  are not placed on the bridge of the nose," and argue there is no issue for the Court to resolve.

13  (Doc. 88 at 15.) The Court agrees with Defendants that Plaintiffs clearly and unmistakably

14  disavowed embodiments of vehicles positioned on the bridge of the nose. *See Omega*

15  *Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed.Cir. 2003)

16          The Clark reference discloses an inhaler that is inserted into the nose. (*Id.*) The

17  patentee argued that Clark did not disclose a carrier that is "positioned proximate the flow

18  path" but instead "actually blocks the flow path." (*Id.*) The examiner removed the Clark

19  reference. According to Defendants, however, by "blocks the flow path," the patentee

20  necessarily meant "inserted into the nostrils." (*See* Docs. 85 at 15, 89 at 12.) Therefore,

21  Defendants argue, because the patentee's characterization of the invention as being placed

22  "proximate" the flow path did not include being inserted into the nose, "Plaintiffs have

23  forever given up those embodiments and cannot now as a matter of law attempt to recapture

24  those same embodiments in litigation." (Doc. 85 at 15.)

25          As additional evidence that Plaintiffs disclaimed embodiments inserted into the nose,

26  Defendants cite the patentee's cancellation of proposed claim 22. (Doc. 89 at 12–13.) Claim

27  22 included the requirement that the vehicle be "within, at or below the openings of the

28

respiratory organ." (Doc. 91, Ex. J at 34.) The patentee believed the claim was allowable because "within, at or below the openings of the respiratory openings while leaving said openings unrestricted is believed to define over the cited references." (*Id.* at 38.) The patentee later cancelled claim 22. The record shows that "the Examiner indicated to [the patentee's counsel] that prior art cited in prior office actions, specifically U.S. Patent No. 5,706,800 to Cronk et al and U.S. Patent No. 888,869 to Clark, read on the newly submitted claim 22. Applicant agreed to cancel claim 22 because claims 1–16 and claim 21 are allowable over the prior art of record." (*Id.* at 41.)

Plaintiffs argue that the patentee simply agreed to cancel proposed claim 22 in order to facilitate issuance of the patent, because the Examiner had already allowed claims 1–16 and claim 21. They note that notwithstanding the applicant's statements regarding Clark, the Examiner allowed claims inserting the device into the nose: dependent claim 15, which states that, "The vehicle of claim 11, wherein the means includes a deformable element deformably engagable against the respiratory organ," and dependent claim 16, "The vehicle of claim 11, wherein the means includes a clip clippingly engagable against the respiratory organ."

Plaintiffs also note that there were several differences between proposed claim 22 and the issued claims; for example, in contrast to the claims that were issued, claim 22 did not include the limitation of a "barrier." Therefore, Plaintiffs argue, because the requirement in proposed claim 22 that the vehicle be "within, at or below the openings of the respiratory organ" was not the only distinction between the proposed and issued claims, the cancellation of claim 22 did not constitute a disclaimer.

The Court agrees with Plaintiffs that these details of the applicant's cancellation of proposed claim 22 do not support a finding of disclaimer. "[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Omega*, 334 F.3d at 1325–26; *see Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed.Cir. 2008) ("prosecution disclaimer does not apply to an ambiguous disavowal.") There is no "clear and

unmistakable" disavowal if the statements are subject to "more than one reasonable interpretation." *Seirus Innovative Accessories, Inc. v. Bula America, Inc.*, No. 08-CV-2234 H(WMC), 2010 WL 5585509, at *2 (S.D.Cal. October 14, 2010) (quoting *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed.Cir. 2005)). Here, the statements made concerning the Clark reference and withdrawn claim 22 are subject to more than one reasonable interpretation.

Based on the foregoing, the court will construe "proximate an inhalation flow path" as "close to or within the entrance to the mouth and/or the nasal passages and not on the bridge of the nose."

Plaintiffs define "engaging the carrier to a surface of the skin" as "bringing the vehicle into contact with the skin." Defendants' proposed definition is "adhering to the surface of the skin."

Defendants contend that their construction is consistent with the ordinary meaning of "engaging." (Doc. 85 at 15.) They also argue that the patentee surrendered all non-adhesive claims during prosecution of the Patent—specifically, "embodiments using deformable members or clips to position the device in the nasal cavities." (Doc. 89 at 15.)

As described above, the Court finds there was no disclaimer related to embodiments of the vehicle inserted into the nose. The Court also finds, as discussed in more detail below, that there was no disclaimer of embodiments using deformable members or clips. The specification disclosed a clamp and a deformable element that could be used to keep the vehicle in contact with the skin. The Court concludes, therefore, that Defendants' proposed construction of "adhering to the surface of the skin" is too narrow and improperly limits the scope of the claim. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed.Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context.").

However, the Court agrees with Defendants that Plaintiffs' construction—"bringing

- 14 -

the vehicle into contact with the skin"—is imprecise. In every embodiment described, the vehicle is attached to, not merely brought into contact with, the skin, whether by an adhesive, a clamp, or a deformable element. Therefore, the Court will construe "engaging the carrier to a surface of the skin" as "attaching the vehicle to the skin."[1]

The parties agree that "means for engaging the carrier to the surface of the skin" is a "means-plus-function" term governed by 35 U.S.C. § 112(f). Construction of a means-plus-function limitation involves two steps. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed.Cir. 2002). First, the court must identify the claimed function. *Id.* The court must construe the function to include the limitations contained in the claim language, and only those limitations. *Id.* It is improper to narrow the scope of the function beyond the claim language, or to broaden the scope of the claimed function by ignoring clear limitations in the claim language. *Id.*

After identifying the claimed function, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. *Id.* In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function. *Id.* To determine the structures, the court must "consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Budde v. Harley–Davidson, Inc.*, 250 F.3d 1369, 1379–80 (Fed.Cir. 2001). "[P]roper construction should account for 'all structures in the specification corresponding to the claimed function' and it would be error to limit the structure to be just the preferred embodiment." *Seirus*, 2010 WL 5585509, at *2 (quoting *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed.Cir. 2005)).

---

[1] This construction is supported by dictionary definitions of the words engage, adhere, and attached. Engage is defined as "to come together and interlock." Adhere: "to hold fast or stick by or as if by gluing, suction, grasping, or fusing." Attach: "to make fast (as by tying or gluing)." Merriam-Webster's Collegiate Dictionary (11th ed. 2008).

1    The means-plus-function limitation covers both distinct and alternative structures.

2  *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed.Cir. 2002). Additionally,

3  "[w]hen multiple embodiments in the specification correspond to the claimed function,

4  proper application of § 112[] generally reads the claim element to embrace each of those

5  embodiments." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250,

6  1258–59 (Fed.Cir. 1999).

7    Plaintiffs' proposed construction of function is "bringing the vehicle into contact with

8  the skin." Defendants propose "attaching the carrier to the surface of the skin proximate an

9  inhalation flow path." Neither construction is satisfactory. As Plaintiffs note, Defendants'

10 proposed construction, which describes the function as attaching the carrier to the surface of

11 the skin, is inconsistent with the claim language: "means for engaging the carrier to a surface

12 of skin proximate an inhalation flow path of the respiratory organ with the barrier adapted

13 to be interposed between the carrier and the surface of skin." (Doc. 59, Ex. A, col. 8, ll.

14 37–42). Thus, while the vehicle comes into contact with the skin, the barrier is designed to

15 be interposed between the carrier and the skin. Contrary to Defendants' proposed

16 construction, therefore, there is no requirement that the carrier itself must come into contact

17 with the skin. Next, for the reasons discussed above, Plaintiff's description of function as

18 bringing the vehicle "into contact with" the skin is imprecise. Accordingly, the Court will

19 construe the function as "attaching the vehicle to the skin proximate an inhalation flow path."

20   For the corresponding structure, Plaintiffs propose "adhesive, clamp, deformable

21 element, deformable member, and equivalents thereof," while Defendants propose "adhesive

22 and equivalents thereof that were not disclaimed in prosecution." Plaintiffs argue that their

23 construction is supported by the claims and specification. The Court agrees. Dependent

24 claims of the Patent provide that the means include an "adhesive" (claim 13), "a deformable

25 element" (claim 15), and "a clip" (claim 16). Similarly, the specification provides that:

> user 21 may then engage adhesive backing 33 to his or her body proximate one
> or more of inhalation flow paths 24 and 25 such as, as shown in FIG. 1,
> adjacent the external openings of the nasal passages of nose 23.

- 16 -

1

2

> Deformable member 55 thus permits the clamping of vehicle 50 against not only septum 56, but also to the external sidewalls 57 and 58 of nose bounding the external openings into the nasal passages if so desired.

3

4

> Clamp 61 permits the clipping engagement of vehicle 50 against, for instance, one of at least the septum and external sidewalls bounding the external openings of the nasal passages of the nose of a user.

5

(Doc. 59, Ex. A, col. 3, ll. 41–44; col. 4, ll. 20–25, 49–52.)

6

7

8

Defendants again seek to limit the corresponding structure to "adhesive." The Court has rejected Defendants' argument that the applicant surrendered the all non-adhesive structures encompassed by the disputed "means for" claim language.

9

10

11

12

13

14

15

16

17

18

19

Defendants argue that the patentee failed to "clearly link" certain structures with the claimed function. (Doc. 85 at 17.) Specifically, they argue that the patentee does not clearly state that the clip and deformable element are for "engaging the vehicle to the skin proximate an inhalation flow path." Defendants cite, for example, the patentee's statement that the structures are for clamping or clipping "of vehicle 50 against not only septum 56, but also to the external sidewalls 57 and 58 of nose bounding the external openings into the nasal passages if so desired." (Doc. 59, Ex. A, col. 4, ll. 20–25, 49–52; *see* FIG. 4 & 5.). According to Defendants, therefore, the structures do not engage the vehicle to the skin *proximate* an inhalation flow path, and this failure "to clearly associate the structures with the function results in those structures not being covered by means-plus-function claiming." (Doc. 89 at 17.)

20

21

22

23

24

The Court disagrees. Having rejected Defendants' contention that Plaintiffs disclaimed embodiments inserted into the nose, and having construed "proximate an inhalation flow path" as "close to or within the entrance to the . . . nasal passages . . . ," the Court finds that the clip and deformable element do engage the vehicle to the skin proximate an inhalation flow path.

25

26

27

28

Accordingly, "[a]fter considering the specification as a whole and reading the written description in a manner that renders the patent internally consistent," *Budde*, 250 F.3d at 1379–80, the Court concludes that the specification and claim history clearly link or associate

- 17 -

the deformable element and clip to the function attaching the vehicle to the skin. *See Omega*, 334 F.3d at 1322; *see also Seirus*, 2010 WL 5585509, at *2.[2] The Court will construe structure to include the embodiments disclosed in the specification: adhesive, clamp, deformable element, or deformable member.

### IV.  Conclusion

For the foregoing reasons, the Court construes the disputed claim terms as set forth above.

**IT IS SO ORDERED.**

DATED this 23rd day of July, 2013.

Paul G. Rosenblatt
United States District Judge

---

[2] In *Seirus*, the court construed terms for a patented ski mask and scarf, including the term "securing means." 2010 WL 5585509, at *7. The court noted that, "The specification discloses that 'a variety of snaps, strings, or other fastening devices' may be used as a securing means. The specification further discloses that co-acting fasteners, such as VELCRO, can be used as a securing means in a preferred embodiment." *Id.* The court therefore defined securing means" to be these identified structures—namely, snaps, strings, co-acting fasteners, and other fastening devices. *Id.*, at *7